IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

MICHAEL MARSHALL,           )  Civil Action No. 2:10-699-RMG-BM
                              )
            Plaintiff,      )
                              )
v.                             )
                              )  **REPORT AND RECOMMENDATION**
AT&T MOBILITY, LLC,       )
                              )
            Defendant.     )
_____)

          This action was originally filed by the Plaintiff in the United States District Court in the Western District of Pennsylvania. On March 16, 2010, Plaintiff's claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et. seq., in Count One of his amended Complaint was transferred to the United States District Court for the District of South Carolina, with the Pennsylvania Court retaining jurisdiction over the remainder of Plaintiff's claims.

          The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on February 15, 2011. Plaintiff filed a memorandum in opposition on March 16, 2011, in which Plaintiff voluntarily agreed to dismiss his claim for a hostile work environment. Plaintiff continues to assert ADA claims for wrongful discharge and failure to accommodate. Defendant filed a reply memorandum on March 28, 2011.



1

Defendant's motion is now before the Court for disposition.[1]

### Background and Evidence[2]

Plaintiff, a former employee of the Defendant, was employed by the Defendant in June 2006 as a Retail Sales Consultant. See Plaintiff Deposition, pp. 8, 24-25. In or around October 27, 2007, Plaintiff became the Store Manager of the Montague Avenue retail location in Charleston, South Carolina. See Plaintiff Deposition, pp. 31-32. As Store Manager, Plaintiff's direct supervisor was the Area Retail Sales Manager ("ARSM"). Initially, this person was Scott Marshall (no relation to Plaintiff). See Plaintiff Deposition, pp. 25, 34. During the time in which Scott Marshall was his direct supervisor, Plaintiff did not experience any conduct which he considered to be harassing or discriminatory. See Plaintiff Deposition, p. 39.

In or around December 2007, Scott Marshall left the ARSM position, and Allison Stoney became the acting/interim ARSM while the Defendant interviewed candidates to fill the position on a permanent basis. See Plaintiff Deposition, pp. 34, 36; Stoney Deposition, pp. 6, 10-12. Stoney served as interim ARSM for approximately eight months, until August 1, 2008, at which time Scott Grimsley took over as ARSM for the Columbia, Florence, Charleston, and Georgetown markets on a permanent basis. See Plaintiff Deposition, p. 37; Stoney Deposition, pp. 9, 43; Grimsley

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendant has filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2]The Defendant submitted a statement of undisputed facts. In his response, Plaintiff specifically referenced each fact and agreed that the majority of the facts were undisputed. Therefore, Defendant's rendition of the facts is set forth herein. Where the Plaintiff did dispute a fact as asserted by the Defendant, it is so noted in this section. Any disputed facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

2



Deposition, pp. 10, 21.[3]

In or around November 2008, Plaintiff met with Maureen Christensen, Director of Sales, and Jennifer Argoe from Human Resources.  See Plaintiff Deposition, p. 55; Grimsley Deposition, pp. 38-39.  Grimsley did not attend this meeting because he was on vacation at the time. See Grimsley Deposition, pp. 38-39.  Christensen and Argoe called the meeting in order to discuss their concern over a website that had been brought to their attention - www.suicidecountdown.com - which Plaintiff had created and posted online.  See Plaintiff Deposition, pp. 55-56.  Plaintiff's website identified who he was, contained a "ticking countdown," and solicited monetary donations from visitors.[4]  See Plaintiff Deposition, p. 56.  During this meeting, Christensen and Argoe expressed their concern to Plaintiff about his well being in light of their finding out about his website. See Plaintiff Deposition, pp. 55, 58.  Plaintiff told Christensen and Argoe that he "never intended for anyone at AT&T to find out about it, . . . and that it was a personal matter that [he] felt should not be brought up at work."  See Plaintiff Deposition, p. 126.[5]

While Plaintiff had not yet received any sort of formal medical diagnosis at that time,

---

[3]Plaintiff contends that while serving as acting/interim ARSM, Stoney often acted inappropriately over the course of her supervision of him.  However, since Plaintiff has voluntarily dismissed his hostile work environment claim, those facts are not discussed in this section except as they relate to Plaintiff's remaining claims.  After Stoney left the position and Grimsley took over as ARSM on a permanent basis in August 2008, Plaintiff did not experience any behavior which he considered or perceived to be harassing.  See Plaintiff Deposition, p. 54.

[4]Plaintiff testified at his deposition that he was experiencing money trouble during this time. See Plaintiff Deposition, p. 57.

[5] Nevertheless, Plaintiff took down the website "pretty much immediately" after his meeting with Argoe and Christensen.  See Plaintiff Deposition, p. 128.  Stoney testified that Plaintiff's suicide website was discussed among the Defendant's employees in the region.  See Stoney Deposition, pp. 24-26.



he shared with Christensen and Argoe during this meeting some symptoms he alleges he was experiencing, "such as [ ] anxiety and panic and depression." See Plaintiff Deposition, pp. 55, 58, 60. In response to this disclosure, Christensen and Argoe advised Plaintiff about short term disability benefits. According to Plaintiff, "[t]hey did not guarantee I would get it, but they did not [sic] present it as I was eligible to apply for it. They said, you're eligible for the maximum short-term disability and see your doctor." See Plaintiff Deposition, pp. 77-78.

Subsequently, in late 2008 and early 2009, Plaintiff and Grimsley met for lunch on two separate occasions. According to Plaintiff, he did so "basically just to make [Grimsley] aware of the symptoms I was dealing with." See Plaintiff Deposition, p. 63. Plaintiff felt as though Grimsley "generalized what [he] had said with problems that everyone was having." See Plaintiff Deposition, pp. 63-64. In Plaintiff's response to summary judgment, he expands on Grimsley's reaction, stating that "Grimsley basically told him that everyone was having hard times, dismissed Plaintiff's problems through anecdotal comparison, and told Plaintiff to 'hang in there.'" See Plaintiff's Memorandum in Opposition, p. 4 (citing Plaintiff's Deposition, pp. 63-64). Plaintiff also had conversations with Argoe and Grimsley about relocating to a position in Pennsylvania, "where [he] would have more of a support network around [him]." See Plaintiff Deposition, pp. 64-66.

Plaintiff was told that he was free to apply for any position that was open and available in Pennsylvania. See Plaintiff Deposition, pp. 65-66. Per the Defendant's policy, if an employee wishes to transfer to another market (with an entirely different management team), he or she must apply for an open position within that market and interview with the appropriate hiring manager(s). If it is determined that the employee is the most qualified candidate, he or she will be awarded the position. See Mendolia Affidavit, ¶¶ 3-4. According to Plaintiff, "[t]he short-term disability benefits



were presented to me as a first and foremost option with the reminder that you are free to apply for positions where you do have a more solid support group around you that would help you function better . . . ."  See Plaintiff Deposition, pp. 76-77.  Further, to assist Plaintiff, Argoe "checked to see what kind of openings were available in western Pennsylvania."  See Plaintiff Deposition, p. 65.  However, Plaintiff is not aware of any employee who was allowed to transfer to another market as a means of an accommodation.  See Plaintiff Deposition, p. 66.

On February 4, 2009, Plaintiff had a doctor's appointment with Dr. Pike, his primary care physician.  During this appointment, Dr. Pike stated that "it would be a good idea for Plaintiff to apply for STD benefits."  Also during this appointment, Plaintiff was diagnosed for the first time with depression and anxiety.[6]  See Plaintiff Deposition, pp. 81, 86, 112.  Two days later, on February 6, 2009, Plaintiff and Grimsley met at the Montague location to go over a Performance Improvement Plan ("PIP") that Grimsley had issued to Plaintiff.  See Plaintiff Deposition, p. 91; Grimsley Deposition, pp. 69, 126, 128; see also PIP [Defendant's Exhibit E].[7]  During this meeting, Plaintiff told Grimsley what Dr. Pike had said and also informed Grimsley about his intention to seek STD benefits and take a leave of absence.[8]  See Plaintiff Deposition, pp. 86, 91; Grimsley Deposition, pp.

---

[6]In Plaintiff's response, he argues that although this was the first time that he had been formally diagnosed, he had been taking prescription medications to treat the symptoms of these conditions since approximately October 2006.  See Plaintiff Deposition, pp. 86-87, 103-105.  Plaintiff referred to October 2007 in his brief, but based on his deposition testimony, this  appears to be a scrivener's error.

[7]Although the parties discuss this plan in their factual backgrounds, since it is undisputed that the sole reason given for Plaintiff's subsequent termination was that he failed to return to work or contact his employer for a prolonged period of time, the remainder of the facts dealing with this plan have been omitted.  See  Grimsley Deposition, pp. 11-12.

[8]According to Grimsley, Plaintiff did not mention the issue of STD benefits or his leave of (continued...)



135-136.  However, Plaintiff made no mention during this meeting of moving back to Pennsylvania.[9]

See Plaintiff Deposition, pp. 95-96.  Grimsley told Plaintiff that he would pass along the PIP to

Plaintiff's assistant manager in his absence.   See Grimsley Deposition, pp. 69, 131; Plaintiff

Deposition, pp. 94-95.  The meeting on February 6, 2009, was the last time that Grimsley ever saw

or spoke to Plaintiff.  See  Grimsley Deposition, pp. 69, 131.

       Plaintiff thereafter applied for STD benefits on or about February 9, 2009.  See Letter

dated February 9, 2009 (Defendant's Exhibit F)[acknowledging initiation of Plaintiff's claim for STD

benefits].  Plaintiff's application for STD benefits was denied in a letter dated February 26, 2009.

See Letter dated February 26, 2009 (Defendant's Exhibit G).[10]   As part of the February 26, 2009

letter, Plaintiff was instructed to "[p]lease contact your supervisor to discuss alternative methods to

cover this period of time off and to cover future time off, if you will remain out of the workplace."

See Letter dated February 26, 2009 (Defendant's Exhibit G, p. 3).   However, Plaintiff never

attempted to contact Grimsley by phone, email, or by letter, and he moved back to Pennsylvania in

April 2009.  See Grimsley Deposition, p. 131; Plaintiff Deposition, p. 96.

       Plaintiff testified that he believed his employment had been terminated at that point

because he was not being paid and no one from his supervisory chain contacted him at the time he

---

[8](...continued)
absence until after they had discussed the contents of the PIP.  See Grimsley Deposition, pp. 128,
130-131.

    [9]While Plaintiff acknowledges this fact in his response, he had previously requested a transfer
to a Pennsylvania store so that he would have more of a support network around him to help him deal
with his mental issues.  See Plaintiff Deposition, p. 64-66.

    [10]The decision to deny Plaintiff's application for STD benefits was not made by Grimsley,
Christensen, Argoe, or any Defendant management employee.  See Plaintiff Deposition, p. 98;
Grimsley Deposition, p. 131.



received the letter denying STD benefits.  See Plaintiff Deposition, pp. 96-97, 129.  Grimsley, on the other hand, made several attempts to contact Plaintiff to discuss his return to work.  See Grimsley Deposition, pp. 86, 88-92, 94, 109.  After being notified that Plaintiff's application for STD benefits had been denied, Grimsley made several calls to two different numbers (Plaintiff's cell phone as well as Plaintiff's mother's Pennsylvania cell phone number) in an attempt to speak with the Plaintiff.  See Grimsley Deposition, p. 88; see also Plaintiff Deposition, pp. 99-100 (authenticating phone numbers).  Although Plaintiff never answered these calls, Grimsley did manage to speak with Plaintiff's mother on more than one occasion.  See Grimsley Deposition, p. 88.  During the "first or second time [Grimsley] spoke to [Plaintiff's] mother, [she] said that she had . . . picked [Plaintiff] up and took him back up there [to Pennsylvania] and she wasn't really sure what he was doing."  See Grimsley Deposition, p. 92.  However, Plaintiff's mother never told Grimsley that Plaintiff had moved away from South Carolina on a permanent basis.  See Grimsley Deposition, p. 132. Grimsley also left messages with Plaintiff's mother for Plaintiff to call him back.  See Grimsley Deposition, p. 90. Plaintiff never returned any of these phone calls.

        On May 4, 2009, almost three months after Plaintiff had stopped reporting to work (and, likewise, almost three months since his last contact with any member of management at AT&T Mobility), Grimsley, in conjunction with Human Resources, sent Plaintiff a letter regarding his leave and employment status.  See Grimsley Deposition, pp. 100-101; see also Letter dated May 4, 2009 (Defendant's Exhibit H).  This letter stated in part that Plaintiff "ha[s] not returned to work since 2/9/09 and, therefore, ha[s] been unexcused from work."  It further stated that although Plaintiff had not contacted Grimsley, Plaintiff was being provided one final opportunity to resolve his leave status. See Letter dated May 4, 2009 (Defendant's Exhibit H).  The letter was sent to Plaintiff at his South



Carolina address, as it was, according to Grimsley, "the only address we had." See Grimsley Deposition, p. 102; see also Letter dated May 4, 2009 (Defendant's Exhibit H). Plaintiff testified that he never received this letter. See Plaintiff's Deposition, p. 100.

Over one month later, on June 12, 2009, Grimsley, once again in conjunction with Human Resources, sent Plaintiff a second letter advising him that his employment was being terminated due to job abandonment. See Grimsley Deposition, pp. 112-114; see also Letter dated June 12, 2009 (Defendant's Exhibit I). As with the previous letter, this letter was sent to Plaintiff at his South Carolina address. See Grimsley Deposition, p. 113; see also Letter dated June 12, 2009 (Defendant's Exhibit I). Plaintiff testified that he never received this letter. See Plaintiff Deposition, p. 100.

The decision to terminate Plaintiff for job abandonment was made by several individuals, including Grimsley, Christensen, Argoe, Karen Mendolia (Human Resources), and Allison Hall (Vice President and General Manager). See Grimsley Deposition, pp. 82-83. Grimsley explained the reason for Plaintiff's termination as follows: "[Plaintiff] was sent the termination letter due to no contact with myself or anyone else that I was aware of in our company for quite some time." See Grimsley Deposition, p. 11.

In addition to the above facts submitted by the Defendant (and admitted as indicated by the Plaintiff), Plaintiff submitted the following additional facts. Plaintiff testified that he often experienced panic attacks as a result of Stoney yelling, screaming, and swearing at him. See Plaintiff Deposition, pp. 45-46. At some point while Stoney was still Plaintiff's direct supervisor, he reported Stoney's conduct and the effect it had on him to Christensen and Argoe. See Plaintiff Deposition, pp. 73-74. Although Christensen and Argoe stated that they agreed with Plaintiff and would address



matters with Stoney, Plaintiff did not see any change in Stoney's conduct subsequent to the meeting. See Plaintiff Deposition, p. 74.   Plaintiff testified that as a result of his mental impairments, he has difficulty completing tasks, panic attacks, is unable to concentrate, has difficulty sleeping, and experiences periods of irritability. See Plaintiff Deposition, pp. 102-103. Plaintiff testified that prior to the time he attempted to take disability leave, he had applied for vacant positions in western Pennsylvania but was not selected. See Plaintiff Deposition, p. 65. See Plaintiff Deposition, p. 65. Plaintiff also testified that during his discussions with Argoe, he specifically requested a transfer to western Pennsylvania as an accommodation for his mental health issues, but that no special provisions were made for him to secure or facilitate such a transfer. See Plaintiff Deposition, pp. 65-67.

On April 15, 2009, shortly after Plaintiff's return to Pennsylvania, he was treated by Dr. Fozia Chatta. See Chatta Deposition, p. 9. Dr. Chatta diagnosed Plaintiff as suffering from major depression, generalized anxiety and panic disorder, and hypertension, confirming the diagnosis made by Dr. Pike in South Carolina on February 4, 2009. See Chatta Deposition, pp. 13-15, 38-39; see also Plaintiff Deposition, p. 86. Dr. Chatta opined that, at the time of the first examination, Plaintiff's depression was so severe that he was unable to function without medications and, at the time, could not work in any capacity. See Chatta Deposition, pp. 15-16. Subsequently, Dr. Chatta's diagnosis was confirmed by two psychiatrists. See Chatta Deposition, pp. 21-26; Chatta Deposition Exhibits 4-5. Dr. Chatta opined that Plaintiff's conditions are permanent, although he could function in employment with accommodation. See Chatta Deposition, pp. 28-29, 45.

Finally, Plaintiff testified that he attempted to take advantage of the Defendant's offer to provide a session with a psychiatrist. See Plaintiff Deposition, pp. 61-62. He first contacted the



doctors in the area directly, but none of them knew how to handle billing for a session paid for by the Employee Assistance Program (EAP). <u>See</u> Plaintiff Deposition, pp. 61-62. Plaintiff then called the EAP and asked for assistance in scheduling a session, but he was informed that the EAP could not help him schedule an appointment. <u>See</u> Plaintiff Deposition, pp. 61-62.

### Discussion

Plaintiff asserts causes of action for failure to accommodate[11] and wrongful discharge in violation of the ADA. Defendant seeks summary judgment on both of these claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. <u>Baber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992).

### ADA Claims

In order to maintain a claim under the ADA, Plaintiff must present evidence to show that 1) he is a qualified person with a disability under the ADA, and 2) that the defendant is subject to suit under that statute. 42 U.S.C. § 12112(a); <u>see</u> <u>Pollard v. High's of Baltimore, Inc.</u>, 281 F.3d

---

[11]It is arguable that Plaintiff failed to set forth a separate claim for failure to accommodate under the ADA in his Complaint. However, since Plaintiff's asserted grounds for a failure to accommodate claim are subject to dismissal on the merits, the undersigned has proceeded with a discussion of this issue.



462, 467 (4th Cir. 2002), cert. denied, 123 S.Ct. 122 (2002); Tyndall v. National Education Centers, 31 F.3d 209, 212 (4th Cir. 1994); Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001) [same standards apply to ADA and Rehabilitation Act].[12]  Defendant has not contested that it is subject to suit under the ADA and that Plaintiff, for purposes of its motion, has a disability.

## I.

### (Wrongful discharge)

Plaintiff's ADA wrongful discharge claim is for disparate treatment, based on his allegation that he was discriminated against on the basis of a disability when he was terminated by the Defendant.  Disparate treatment claims under the ADA are evaluated under the same standards as discrimination claims asserted under Title VII of the Civil Rights Act of 1964.  Cunningham v. Enterprise Rent-A-Car Co., No. 07-1615, 2010 WL 724507 at * 4 (W.D.Pa. Mar. 1, 2010)[The same standards govern disparate treatment claims arising under either Title VII or the ADA.]; Loveless v. Sherwin-Williams Co., 681 F.2d 230, 238 (4th Cir. 1982).  Such claims require proof of intentional discrimination, either by direct evidence or by the structured procedures set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Plaintiff has not offered any direct evidence of disability discrimination,[13] and Defendant argues that Plaintiff has failed to present sufficient

---

[12]See also Smaw v. Commonwealth of Virginia Department of State Police, 862 F.Supp. 1469, 1474 (E.D.Va. 1994) ["By design, the ADA standards mirror those of the Rehabilitation Act in this case....The emergence of the ADA does not create a new avenue for claims in the area of disability discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act  in this area."].

[13]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-549 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996);  Black's Law Dictionary, 460 (6th Ed. 1990) (citing State v. McClure, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974);
(continued...)



circumstantial evidence to create a genuine issue of fact under the <u>McDonnell Douglas</u> proof scheme as to whether he was discharged because of his disability to survive summary judgment. The undersigned is constrained to agree.

The United States Supreme Court articulated a three-part formula for analyzing discrimination cases in <u>McDonnell Douglas</u>. <u>First</u>, Plaintiff must establish a prima facie case of discrimination. If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against him. <u>Second</u>, once this presumption has been established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reason for its actions. <u>Third</u>, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiff to come forward with evidence that the Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on Plaintiff's disability. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-805; <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-256 (1981); <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens of production, however, Plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout. <u>Texas Dep't of Community Affairs</u>, 450 U.S. at 252-253; <u>see</u> also <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993).

In order to meet the first prong of the <u>McDonnell Douglas</u> formula and establish a prima facie case of wrongful discharge in violation of the ADA, Plaintiff must by a preponderance

---

[13](...continued)
<u>see</u> <u>Williams v. General Motors Corp</u>, 656 F.2d 120, 130 (5th Cir. 1981), <u>cert.</u> <u>denied</u>, 455 U.S. 943 (1982).



of the evidence show four criteria: first, he must be a qualified person[14] with a "disability"; second, he was discharged; third, he was fulfilling his employer's legitimate expectations at the time of discharge; and fourth, the circumstances of his discharge raise a reasonable inference of unlawful discrimination.  Rohan v. Networks Presentations, LLC, 375 F.3d 266, 272 n. 9 (4th Cir. 2004); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001); Taylor v. Ameristeel Corp., 155 Fed.Appx. 85, 89 (4th Cir. Nov. 18, 2005);  Haneke v. Mid-Atlantic Capital Management, 131 Fed.Appx. 399, 400 (4th Cir. May 10, 2005).  As previously noted, for purposes of its motion the Defendant does not contest that Plaintiff had a disability.[15]  See Memorandum in Support of Summary Judgment, p. 19.  Plaintiff was also discharged.  However, the Defendant contends that Plaintiff cannot meet the third criteria of showing that he was fulfilling his employer's legitimate expectations at the time of his discharge, arguing that the evidence clearly shows that at the time of his discharge Plaintiff had not made any effort to contact his supervisor for almost four months and had abandoned his job.[16]  See Runnebaum v. NationsBank of Maryland, N.A., 123 F.3d 156, 174 (4th

---

[14]A "qualified" person with a disability is someone who, with or without a reasonable accommodation, can perform the essential functions of the position in question.  See 42 U.S.C. A. § 12111(8); Tyndall, 31 F.3d at 213, at n. 1.

[15]The term "disability" is defined as a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, b) a record of such impairment, or c) being regarded as having such an impairment. 42 U.S.C. § 12102(2); Pollard, 281 F.3d at 467.  A "major life activity" is defined as a basic activity that an average person can perform with little or no difficulty, such as walking, hearing, speaking, learning, breathing, standing, lifting, seeing and working.  Appendix to 29 C.F.R. § 1630.2(I); see Bruncko v. Mercy Hosp., 260 F.3d 939, 941 (8th Cir. 2001); Dutcher v. Ingalls Shipbuilding, 53 F.3d 723-727, n. 7 (5th Cir. 1995);  Gupton v. Virginia, 14 F.3d 203, 205 (4th Cir. 1994), cert. denied, 513 U.S. 810 (1994) ( Rehabilitation Act).

[16]The Defendant has not argued that Plaintiff was not meeting its employment expectations on any other basis.  Therefore, the undersigned has assumed that, when he was at work, Plaintiff's
(continued...)



Cir. 1997)[upholding summary judgment in favor of the employer where, *inter alia*, the plaintiff's "continuing utter failure to attend to his assigned duties" established that he was not meeting his employer's expectations for his performance.]; see also Tyndall, 31 F.3d at 213 [An employee who does not come to work cannot perform any of his job functions, essential or otherwise].

Plaintiff argues that he believed his employment had been terminated when he received the letter denying his STD benefits on February 26, 2009, which is why he did not return to work. However, that letter says nothing about Plaintiff being terminated from his job. To the contrary, it specifically states that he would have to repay any benefits he had received from February 16, 2009 through the date he *returned to work*, while Plaintiff was to contact his superior if he intended to remain out of the workplace. See Defendant's Exhibit G. That letter also noted that the reason Plaintiff's request for benefits had been denied was because Plaintiff had failed to provide any medical documentation to support his request, despite repeated requests that he do so, although the letter also advised Plaintiff that the requested records could still be sent.

Plaintiff has presented no evidence to show that he ever sent any such records, and in fact concedes that he failed to even respond to this letter or to ever contact the Defendant again. However, the evidence shows that Grimsley tried to contact Plaintiff, both by calling him and by calling his mother, with whom he left messages for Plaintiff to call him. Plaintiff never answered or returned any of these phone calls. The Defendant also attempted to contact Plaintiff by mail at his last known address. Even assuming Plaintiff's testimony that he never received this mail to be true for purposes of summary judgment, that is not the fault of the Defendant. Plaintiff concedes that he

---

[16](...continued)
job performance was otherwise satisfactory.



never advised the Defendant he had a new or changed address, a concession he has to make considering that he also conceded he never contacted anyone with the Defendant about anything after he received the February 26th letter, and in fact had not spoken with anyone with the Defendant since his meeting with Grimsley on February 6, 2009. The Defendant did not finally terminate Plaintiff from his employment until almost four (4) months later, during which he had both never returned to work nor contacted the Defendant in any way.

Even considered in the light most favorable to the Plaintiff, this evidence does not create a genuine issue of act as to whether Plaintiff was adequately performing his job. It goes without saying that "[a] regular and reliable level of attendance is an essential function of one's job." Lamb v. Qualex, Inc., 99-1188, 2002 WL 500492, at * * 5-6 (4th Cir. Apr. 3, 2002) (citing Halperin v. Abacus Technology Corp., 128 F.3d 191, 199, n. 10 (4th Cir. 1997), abrogated on other grounds by , Baird ex rel. Baird v. Rose, 192 F.3d 462 (4th Cir. 1999). Here, the evidence before the Court clearly shows that Plaintiff utterly and completely abandoned his job with the Defendant. Runnebaum, 123 F.3d 174 [upholding summary judgment in favor of the employer where, *inter alia*, the plaintiff's "continuing utter failure to attend to his assigned duties" established that he was not meeting his employer's expectations for his performance.]; Tyndall, 31 F.3d at 212. Plaintiff's own self serving opinion or perception that the February 26, 2009 letter was a termination letter (a conclusion not supported by either the text of that letter or by the other facts in evidence) is not sufficient to create a genuine issue of fact as to whether he was adequately performing his job to establish this element of his prima facie case or to survive the Defendant's motion for summary judgment on this claim. Cf. Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997)[In considering whether a claimant was adequately performing their job, it is the perception of the decision maker

15



which is relevant, not the self assessment of the claimant] <u>overruled on other grounds by</u>, <u>Nat'l. R. R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1565 (11th Cir. 1997)[inquiry centers upon the employer's beliefs, and not the employee's own perception of his performance]; <u>King v. Rumsfeld</u>, 328 F.3d 145, 149 (4th Cir. 2003)[On a motion for summary judgment, a Plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the Plaintiff] was meeting [the employer's] expectations."]; <u>Cook v. CSK Transp. Corp.</u>, 988 F.2d 507, 513 (4th Cir. 1993) ["[U]nsupported allegations do not establish a prima facie case of [ ] discrimination...."].

In any event, even if the Court were to assume for purposes of summary judgment that Plaintiff had presented sufficient evidence to establish his <u>prima facie</u> case, the evidence before the Court is sufficient to establish a legitimate, non-discriminatory reason for the Defendant's decision to terminate his employment.  See <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936, 941 (4th Cir. 1991) [The Defendant's burden of establishing a legitimate, non-discriminatory reason is only one of production, not of persuasion]; <u>Lamb</u>, 2002 WL 500492, at * 56; <u>Runnebaum</u>, 123 F.3d at 174. Therefore, Plaintiff must present evidence of pretext in the making of the decision to terminate him in order to avoid summary judgment on his wrongful discharge claim.

In order to show pretext, Plaintiff must show that "but for" the Defendant's intent to discriminate against him because of his disability, he would not have been terminated.  <u>EEOC</u>, 955 F.2d at 941; <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 234 (4th Cir. 1991).  "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole... must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [discriminatory animus].'"  <u>LeBlanc v. Great American Ins. Co</u>, 6 F.3d 836, 843 (1st Cir. 1993)(citing <u>Goldman v.</u>



<u>First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1117 (1ˢᵗ Cir. 1993)(quoting <u>Connell</u>, 924 F.2d at 1172, n. 3)); <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 141-143 (2000). Plaintiff has failed to present any such evidence.

Plaintiff's pretext argument is that the Defendant should have known that he had moved to Pennsylvania and should have asked his mother for his forwarding address, and that the Defendant's failure to do so shows that the real reason he was fired was because of his disability. However, the undersigned can discern no discriminatory motive in Plaintiff's termination based on the evidence presented. The meeting on February 6, 2009, was the last time that Grimsley ever saw or spoke to Plaintiff. <u>See</u> Grimsley Deposition, pp. 69, 131. While Plaintiff had previously discussed moving back to Pennsylvania, where he had more of a support network, Plaintiff made no mention of moving back to Pennsylvania during this meeting. <u>See</u> Plaintiff Deposition, pp. 95-96. When subsequently Plaintiff's application for STD benefits was denied on February 26, 2009,[17] Plaintiff was advised that,

> the determination to deny benefits is based on the fact that as of the date of this letter, we have not received medical documentation to establish your inability to perform your job as a STORE MANAGER I , with or without reasonable accommodations.
>
> Attempts to obtain medical information for your claim were made on 2/10/2009, 2/12/2009, and 2/24/2009. A voicemail was left on 2/10/2009 asking for medical information; however on the rest of the attempts a person answered and informed this case manager that I had reached the wrong number. Calls were made to you on 2/10/2009, 2/12/2009, and 2/24/2009. On 2/24/2009, a voicemail was left regarding your claim status.
>
> For your claim to qualify for disability benefits, we would need clear documentation

---

[17]As previously discussed, Plaintiff had been encouraged by two of the Defendant's supervisors to apply for STD and the decision to deny Plaintiff's application for STD benefits was not made by Grimsley, Christensen, Argoe, or any Defendant management employee. <u>See</u> Plaintiff Deposition, p. 98; Grimsley Deposition, p. 131.



from your provider(s) on why you are not able to perform the essential duties of your occupation. They would need to document your functional impairments as they relate to your diagnosis. They need to provide a treatment plan for returning you to work and reasonable restrictions with a reasonable duration. This information may be included in the following: chart of progress notes, specialist evaluations, diagnostic test results and/or any other medical information you feel supports your inability to work.

AT&T Integrated Disability Service Center recommends contacting your provider and ensuring requested records are forwarded for review. Once received, we will review such records for a subsequent determination.

<u>See</u> Letter dated February 26, 2009 (Defendant's Exhibit G).

This letter makes clear that Plaintiff's application for STD had been turned down because Plaintiff had failed to provide any medical documentation to support his claim. Plaintiff has provided no evidence, or even argument, to contest this fact, or to show that in response to this letter he ever provided any medical documentation to support his application.

In his response to summary judgment, Plaintiff contends that when he received this letter he believed his employment had been terminated because he was not at that point being paid and no one from his supervisory chain contacted him after he received the letter. <u>See</u> Plaintiff Deposition, pp. 96-97, 129. However, the letter did not say that he would be contacted; rather, it *specifically instructed Plaintiff to contact his supervisor.* <u>See</u> Letter dated February 26, 2009 (Defendant's Exhibit G, p. 3). Plaintiff admits that even though he received this notification, he never contacted anyone with the Defendant. <u>See</u> Plaintiff Deposition, p. 97. Plaintiff then moved back to Pennsylvania two (2) months later, in April 2009, but did not tell anyone with the Defendant that he had moved. <u>See</u> Plaintiff Deposition, p. 96.

Grimsley, on the other hand, made several attempts to contact Plaintiff to discuss his return to work. <u>See</u> Grimsley Deposition, pp. 88-92, 94, 109; <u>see also</u> Plaintiff's Deposition, pp. 99-



18

100 (authenticating phone numbers).  Plaintiff testified that although he did still have his cell phone, he did not turn it on after some point in time.[18]  See Plaintiff's Deposition, p. 100.  Further, although Plaintiff never answered these calls, Grimsley did manage to speak with Plaintiff's mother on more than one occasion and told her that he wanted Plaintiff to call him back.  See Grimsley Deposition, pp. 88, 90, 106.  Plaintiff testified that he could not remember whether he ever got any messages from his mother to call Grimsley, but nevertheless confirmed that he never did so.  See Plaintiff Deposition, p. 100.

While Plaintiff also argues that Grimsley did not attempt to learn Plaintiff's Pennsylvania address or if there was a Pennsylvania address, as noted Grimsley did speak to Plaintiff's mother on several occasions and asked her to have Plaintiff return his call.  At no time during any of these conversations did Plaintiff's mother ever tell Grimsley that Plaintiff had moved away from South Carolina on a permanent basis.  See Grimsley Deposition, p. 132.  In fact, Plaintiff testified that he still owned his house in South Carolina in April 2009 and that at some point he arranged to have his mail forwarded, although he denies that he ever received any letters from the Defendant after the February 26, 2009 letter.  See Plaintiff Deposition, pp. 96, 99.

On May 4, 2009, almost three months after Plaintiff had stopped reporting to work (and, likewise, almost three months since his last contact with any member of management at AT&T Mobility), Grimsley, in conjunction with Human Resources, sent Plaintiff a letter to Plaintiff's South Carolina address regarding his leave and employment status.  See Grimsley Deposition, pp. 100-101; see also Letter dated May 4, 2009 (Defendant's Exhibit H).  In the letter, it states that Plaintiff "ha[s]

---

[18]Plaintiff was referring to after he returned to Pennsylvania, but it is not completely clear whether he also stopped turning it on prior to that time.



not returned to work since 2/9/09 and, therefore, ha[s] been unexcused from work." It further states that Plaintiff has not contacted Grimsley, but provides Plaintiff one final opportunity to resolve his leave status. See Letter dated May 4, 2009 (Defendant's Exhibit H). The letter was sent to Plaintiff at his South Carolina address because, according to Grimsley, it was "the only address we had." See Grimsley Deposition, p. 102; see also Letter dated May 4, 2009 (Defendant's Exhibit H). Plaintiff contends that it was the only address the Defendant had because Grimsley failed to ask Plaintiff's mother for his address in Pennsylvania, and that he never received this letter. See Grimsley Deposition, pp. 99-101, 105-106.

Over one month later, on June 12, 2009, Grimsley, once again in conjunction with Human Resources, sent Plaintiff a second letter advising him that his employment was being terminated due to job abandonment. See Grimsley Deposition, pp. 112-114; see also Letter dated June 12, 2009 (Defendant's Exhibit I). Grimsley explained the reason for Plaintiff's termination as follows: "[Plaintiff] was sent the termination letter due to no contact with myself or anyone else that I was aware of in our company for quite some time." See Grimsley Deposition, p. 11. The decision to terminate Plaintiff for job abandonment was made by several individuals, including Grimsley, Christensen, Argoe and Karen Mendolia (Human Resources), and Allison Hall (Vice President and General Manager). See Grimsley Deposition, pp. 82-83.

As with the previous letter, this letter was sent to Plaintiff at his South Carolina address. See Grimsley Deposition, p. 113; see also Letter dated June 12, 2009 (Defendant's Exhibit I). And, like the previous letter, Plaintiff testified that he never received this letter. See Plaintiff Deposition, p. 100. However, even if the Court were to accept Plaintiff's argument that the Defendant could have done more to find a better address for him in Pennsylvania, this is not evidence

20



of discrimination.  Grimsley had made numerous attempts to contact Plaintiff in Pennsylvania, including speaking with Plaintiff's mother, without success, and it is undisputed in the record that the address to which this correspondence was sent was the address Plaintiff had on file with the Defendant.  Kariotis v. Navistar Intern. Transp. Corp., 131 F.3d 672, 680 (7th Cir. 1997) ["Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination.  Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection."]; Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998); cf. Rudolph v. Hechinger, 884 F.Supp. 184, 188 (D.Md. 1995) ["Title VII (does) not protect against unfair business decisions - only against decisions motivated by unlawful animus"], citing Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir. 1977); Colbert v. Tapella, 677 F.Supp. 2d 289, 295 (D.D.C. 2010)(quoting Hairsine v. James, 517 F.Supp.2d 301, 308-309 (D.D.C. 2007)["[T]he scope of review in employment discrimination cases is more narrow than [Plaintiff] wishes because federal courts are not review boards for local employment decisions . . . . A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; [the ADA] protects discriminatory decisions, not wrong ones."].

On April 15, 2009, shortly after Plaintiff's return to Pennsylvania, he was treated by Dr. Fozia Chatta.  See Chatta Deposition, p. 9.  Dr. Chatta diagnosed Plaintiff as suffering from major depression, generalized anxiety, panic disorder and hypertension, confirming the diagnosis made by Dr. Pike in South Carolina on February 4, 2009.  See Chatta Deposition, pp. 13-15, 38-39; see also Plaintiff Deposition, p. 86.  Dr. Chatta opined that, at the time of the first examination, Plaintiff's depression was so severe that he was unable to function without medications and, at the time, could



not work in any capacity.  See Chatta Deposition, pp. 15-16.  Subsequently, Dr. Chatta's diagnosis was confirmed by two psychiatrists.  See Chatta Deposition, pp. 21-26; Chatta Deposition Exhibits 4-5.  Dr. Chatta opined that Plaintiff's conditions are permanent, although he could function in employment with accommodation.  See Chatta Deposition, pp. 28-29, 45.  However, there is no evidence that any of this information was ever relayed to the Defendant prior to Plaintiff's termination.  Cf. Starnes v. General Electric Co., 201 F.Supp.2d 549, 561 (M.D.N.C. 2002)["Plaintiff's claim that he was performing adequately prior to the onset of his alleged disability does not evidence  pretext in light of the fact that immediately prior to his termination, Plaintiff stayed out of work for months without a medical excuse."].

Furthermore, Plaintiff does not dispute receiving the Defendant's letter dated February 26, 2009, which requested him to contact the Defendant.  See Defendant's Exhibit G, p. 3.  Plaintiff's failure to do so or to follow up with the Defendant in any way supports the action taken in this case.

> It is undisputed that [the plaintiff] failed to return to work or contact [the employer] to request accommodation [after his request for disability benefits was denied].  [The plaintiff] has not shown that other employees who absented themselves from work without contacting [the employer] were treated more favorably.  A reasonable fact-finder could not disbelieve that [the plaintiff] abandoned his job or believe that invidious discrimination was the cause of the separation.  Accordingly, Defendant's Motion for Summary Judgment will be granted.  See Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1182-1183 (10th Cir. 2006)[summary judgment in favor o[f] employer where plaintiff failed to call into question employer's application of job abandonment policy]; LaResca v. American Tel. & Tel., 161 F.Supp.2d 323, 336 (D.N.J. 2001)[same].

Spak v. MetLife, No. 06-152, 2008 WL 4671800 at **6-7 (M..D.Pa. Oct. 20, 2008); Walton v. Manassas, No. 97-2702, 1998 WL 545895 at *2 (4th Cir. Aug. 14, 1998); Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n. 3 (4th Cir. 1997)[noting that employer is free to discharge employee for



misconduct even when related to disability]. The evidence before the Court is not sufficient to show pretext or to create a genuine issue of fact as to a discriminatory animus in Plaintiff's termination. Therefore, Plaintiff's wrongful discharge claim is without merit and should be dismissed. See Boden v. U.S. Amada Ltd., 978 F.Supp. 657, 659 (E.D.N.C. 1997) [former employee's own belief and conclusory statements that he had been discriminated against based on a disability is not sufficient to raise reasonable inference of unlawful discrimination]; Ennis v. National Ass'n of Business and Education Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995) [to establish a case of discrimination under the ADA, Plaintiff must show that his termination occurred under circumstances that raise a reasonable inference of unlawful discrimination]; see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) [there must be evidence on which a jury could reasonably find for the Plaintiff]; Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) ["unsubstantiated allegations" are insufficient to defeat summary judgment]; Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985) [a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable treatment was the result of discrimination...."].

## II.

### (Failure to Accommodate)

Plaintiff asserts that the Defendant failed to accommodate his disability when it failed to arrange for him to transfer his job to Pennsylvania, and apparently, by also failing to secure STD benefits for him. In order to establish a prima facie case for failure to accommodate, Plaintiff must show: (1) he had a "disability"; (2) the Defendant had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of his position; and (4) the employer



refused to make such accommodations. Haneke, 131 Fed.Appx. at 400. For purposes of its motion, the Defendant has assumed that Plaintiff can prove the first and second criteria of his prima facie case. See Memorandum in Support of Summary Judgment, p. 19. With regard to the fourth element, Plaintiff contends that the Defendant denied him two specific accommodations - STD benefits and/or a transfer. It is undisputed that Plaintiff applied for STD benefits and also requested a transfer as an accommodation. It is also undisputed that Plaintiff's transfer request was not approved.

However, Defendant contests Plaintiff's claim that he could have performed the essential elements of his job if he had been transferred to Pennsylvania. Defendant notes that on April 15, 2009, shortly after Plaintiff's return to Pennsylvania, he was treated by Dr. Fozia Chatta. See Chatta Deposition, p. 9. Dr. Chatta diagnosed Plaintiff as suffering from major depression, generalized anxiety, panic disorder and hypertension, confirming the diagnosis made by Dr. Pike in South Carolina on February 4, 2009. See Chatta Deposition, pp. 13-15, 38-39; see also Plaintiff Deposition, p. 86. Dr. Chatta opined that, at the time of the first examination, Plaintiff's depression was so severe that he was unable to function without medications and, at the time, could not work in any capacity. See Chatta Deposition, pp. 15-16. Subsequently, Dr. Chatta's diagnosis was confirmed by two psychiatrists. See Chatta Deposition, pp. 21-26; Chatta Deposition Exhibits 4-5. Defendant argues that this evidence shows that Plaintiff could not have performed his job even with his requested accommodation. Lamb v. Qualex, Inc., 33 Fed. Appx. 49 (4th Cir. 2002)[summary judgment in favor of defendant employer upheld where the plaintiff, a clinically depressed employee, failed to produce evidence showing that he could perform the essential functions of his job with reasonable accommodation].

However, Dr. Chatta did also later opine that, while Plaintiff's conditions are



permanent, he could function in employment with an accommodation. See Chatta Deposition, pp. 28-29, 45. While Dr. Chatta does not state what that accommodation would be,[19] even if the Court were to assume arguendo that Plaintiff could have performed the essential functions of his job for at least part of the time period at issue, Plaintiff's evidence does not satisfy the remaining McDonnell Douglas criteria.

With respect to whether the Defendant has met its burden of producing a legitimate, non-discriminatory reason for its actions, the Defendant has submitted evidence to show that it had a neutral policy of requiring employees wishing to transfer to apply in that division with that manager and that the most qualified employee would be selected. Furthermore, the letter denying Plaintiff STD benefits stated that the Defendant had not received medical documentation to confirm Plaintiff's disability and specifically requested Plaintiff to send documentation that he was not able to perform the essential functions of his job. See Letter dated February 26, 2009 (Defendant's Exhibit G). Plaintiff has presented no evidence to show that he ever sent this information to the Defendant. This evidence is sufficient to establish a legitimate, non-discriminatory reason for the Defendant's actions. See EEOC v. Clay Printing Co., 955 F.2d at 941 [The Defendant's burden of establishing a legitimate, non-discriminatory reason is only one of production, not of persuasion]. Therefore, Plaintiff must present evidence of pretext in the making of the decision not to accommodate him with a transfer or STD benefits in order to avoid summary judgment on his failure to accommodate claim.

_____

[19]Plaintiff has the burden of showing that he could perform his job with an accommodation. Shin v. University of Maryland Medical System Corp., 369 Fed. Appx. 472, 481 (4th Cir. 2010)["The Plaintiff bears the burden of identifying an accommodation that would allow a qualified individual to perform a job, as well as the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable."]; Lamb v. Qualex, Inc., 33 Fed. Appx. 49, 59 (4th Cir. 2002)(citing Halperin, 128 F.3d 191, 197 (4th Cir. 1997)).



Plaintiff has failed to present any such evidence.

First, there is no evidence of a discriminatory animus by the Defendant in the denial of STD benefits.  LeBlanc, 6 F.3d at 843 [Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole . . . must be sufficient for a reasonable fact finder to infer that the employer's decision was motivated by [discriminatory animus.]'].  It is undisputed that it was the Plaintiff's supervisors who encouraged him to apply for STD benefits, while conversely the decision to deny Plaintiff's application for STD benefits was not made by Grimsley, Christensen, Argoe, or *any* management employee of the Defendant.  See Plaintiff Deposition, p. 98; Grimsley Deposition, p. 131.  Further, the reason for denying benefits as stated in the letter was that Plaintiff had failed to provide medical documentation to support his claim.  The letter also specifically requested that Plaintiff send documentation that he was not able to perform the essential functions of his job, and that once such documents were received, they would be reviewed for a subsequent determination. See Letter dated February 26, 2009 (Defendant's Exhibit G).  Plaintiff has presented no evidence to show that he ever forwarded any such documentation to the Defendant, and in fact has not even argued that he ever made any attempt to do so.  Accordingly, Plaintiff has not shown any pretext with regard to the denial of his STD benefits.

With respect to the Defendant's failure to secure or facilitate a transfer of the Plaintiff to an open position in Pennsylvania, a transfer could be a reasonable accommodation where it has been the employer's practice to do so.  Felix v. City and County of Denver, 729 F.Supp.2d 1243, 1264 (D.Colo. 2010); Geuss v. Pfizer, 971 F.Supp. 164, 174-175 (E.D.Pa. 1996)[Applying rule that employer might be required to transfer an employee to a new supervisor (or department) to accommodate employee's disability but, at a minimum, the employee must first show that the



employer abides such transfers in other situations].  Here, however, it is undisputed that the

Defendant's policy was if an employee wished to transfer to another market (with an entirely different

management team), he or she had to apply for an open position within that market and interview with

the appropriate hiring manager(s).  If it was determined that the employee was the most qualified

candidate, he or she would be awarded the position.  Id.  The evidence shows that the Defendant

complied with this policy because Plaintiff was informed that he could apply for any position that

was open and available in Pennsylvania, and Argoe assisted him by locating available openings in

Western Pennsylvania.  While Plaintiff did not receive one of these positions, Plaintiff has not

provided any evidence to show that he was denied one of these positions even though he was the

most qualified applicant for any open position, nor has he so argued.

The question, then, is whether the Defendant's failure to award one of these open

positions to the Plaintiff as an accommodation for his disability is, by itself, an ADA violation.

While there is no definitive Fourth Circuit case on this question, it does not appear that the law

requires such an outcome.

> The Fourth Circuit has not addressed whether the ADA requires an employer, as a
> reasonable accommodation, to give a current disabled employee preference in filling
> a vacant position when the employee is able to perform the job duties, but is not the
> most qualified candidate.  However, most of the circuits which have examined the
> issue have found that the ADA is not an affirmative action statute and does not
> require such action.  See Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 483 (8th Cir.
> 2007)[finding that the ADA does not require an employer to turn away a superior
> applicant in preference to the disabled employee]; Hedrick v. W. Reserve Care Sys.,
> 355 F.3d 444, 459 (6th Cir. 2004); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1311, 332
> U.S.App.D.C. 256 (D.C. Cir. 1998)[finding that there is "no duty to afford [plaintiff]
> a hiring preference-because of his disability-over a more qualified, non-disabled
> applicant."]; Terrell v. US Air, 132 F.3d 621, 627 (11th Cir. 1998); Wernick v. Fed.
> Reserve Bank of N.Y., 91 F.3d 379, 384-385 (2d Cir. 1996); Daugherty v. City of El
> Paso, 56 F.3d 695, 700 (5th Cir. 1995)[noting "we do not read the ADA as requiring
> affirmative action in favor of individuals with disabilities, in the sense of requiring



that disabled persons be given priority in hiring or reassignment over those who are not disabled."]

<u>Jackson v. FUJIFILM Mfg. USA, Inc.</u>, No 09-1328, 2011 WL 494281 at *2 (D.S.C. Feb. 7, 2011); <u>see also</u> <u>E.E.O.C. v. Humiston-Keeling, Inc.</u>, 227 F.3d 1024, 1028-1029 (7th Cir. 2000)["[T]here is a difference, one of principle and not merely of cost, between requiring employers to clear away obstacles to hiring the best applicant for a job, who might be a disabled person or a member of some other statutorily protected group, and requiring employers to hire inferior (albeit minimally qualified) applicants merely because they are members of such a group.  That is affirmative action with a vengeance.  That is giving a job to someone solely on the basis of his status as a member of a statutorily protected group.  It goes well beyond enabling the disabled applicant to compete in the workplace, or requiring the employer to rectify a situation (such as lack of wheelchair access) that is of his own doing."]; <u>cf.</u> <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1257, n. 3 (11th Cir. 2001) [employer who goes beyond the demands of the law to help a disabled employee is under no legal obligation to continue doing so].

Plaintiff testified that he was not aware of any other employee within the company who was transferred as a means of accommodation to another market or area, and he has otherwise failed to present any evidence that it was the Defendant's practice to do so.  Plaintiff's Deposition, p. 66; <u>see</u> <u>Guess</u>, 971 F. Supp. At 174-175.  Plaintiff has also failed to present any evidence to show, or  even to argue, that he was the most qualified applicant for any of the positions at issue.  Hence, Plaintiff has offered no evidence to show a discriminatory animus in this decision other than his own speculation.  <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980)[Plaintiff's own perception is not relevant]; <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)[A party opposing summary judgment

28



"cannot create a genuine issue of fact through mere speculation or the building of one inference upon another"]. Accordingly, the evidence is not sufficient to create a genuine issue of fact that Plaintiff was denied a transfer due to a discriminatory animus sufficient to survive summary judgment on this claim. Anderson, 477 U.S. at 250 [there must be evidence on which a jury could reasonably find for the Plaintiff]; Evans, 80 F.3d at 960 ["unsubstantiated allegations" are insufficient to defeat summary judgment]; Gairola, 753 F.2d at 1288, n. 4 [a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable treatment was the result of discrimination...."]. Therefore, to the extent Plaintiff even properly raised a failure to accommodate claim in his Complaint, the Defendant is entitled to summary judgment on this claim.

### Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the notice page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

May 11, 2011
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

